USDC SCAN INDEX SHEET

















TKL    10/13/05    8:45

3:05-CV-00595   ORANGE 21 INC. SEC. V.

*28*

*AMDCMP.*

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
WILLIAM S. LERACH (68581)
DANIEL S. DROSMAN (200643)
TED MINAHAN (227969)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| In re ORANGE 21 INC. SECURITIES LITIGATION | ) | No. 05-CV-0595-JM(BLM) |
|---|---|---|
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | ) ) ) | |
| | | DEMAND FOR JURY TRIAL |

# INTRODUCTION AND OVERVIEW

1.      This is a class action on behalf of those who purchased or otherwise acquired the common stock of Orange 21, Inc. ("Orange 21" or the "Company") pursuant to the Company's false and misleading Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with its December 14, 2004 initial public offering ("IPO"), seeking to pursue remedies under the Securities Act of 1933 ("1933 Act"). Orange 21 designs, develops and markets products for the action sports and youth lifestyle markets, including sunglasses, goggles, apparel and accessories. Its principal products, sunglasses and goggles, are marketed under the brand Spy Optic. The Company sells its products in approximately 4,100 retail locations in the United States and through approximately 2,000 international retail locations serviced by the Company and its international distributors.

2.      Orange 21 went public on December 14, 2004, when it accomplished its IPO of 3.48 million shares at $8.75 per share. Pursuant to the Registration Statement, Orange 21 sold 2.48 million of those shares for net proceeds of $18.9 million. Orange 21's largest and controlling shareholder, No Fear, Inc. ("No Fear"), sold 1 million shares – approximately 27% of its holdings – pocketing $8.1 million.

3.      In fact, the Registration Statement was materially false and misleading and failed to disclose, among other things:

(a)      The Company had been threatened with an expensive and devastating patent infringement suit by Oakley, Inc. ("Oakley");

(b)      The Company was at risk of losing one of its largest retail customers, Iacon; and

(c)      The Company was incurring or about to incur an enormous restructuring cost associated with its transition from a non-exclusive third-party distributor model to a dealer-direct model in France and Italy.

4.      On February 17, 2005 – just over two months after the IPO – Orange 21 disclosed to the market that it planned to restructure its sales and distribution model in Italy and France at a cost of at least $600,000 to $700,000 annually. *This news caused Orange 21's stock price, which was previously trading at $9.50, to collapse to $6.60 per share on volume of 2.3 million shares, by far the largest one-day price drop (31% fall from the previous day's close) and stock volume for Orange 21 since it went public.*

5.      As certain of the facts set forth in ¶3 made their way into the marketplace, Orange 21's stock price remained low and continued to trend downward, ultimately reaching a low price of $4.50 per share in late June 2005.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act (15 U.S.C. §§77k and 77o).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

8.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the defendants maintain offices in this District and many of the acts and practices complained of herein occurred in substantial part in this District, including the preparation and dissemination of materially false and misleading statements and the omission of material information complained of herein.

9.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

10. Plaintiff Christine Pittman acquired the common stock of Orange 21 pursuant to the Company's Registration Statement filed in connection with the IPO, as set forth in the accompanying certification, and has been damaged thereby.

11. Defendant Orange 21 is headquartered in Carlsbad, California and describes itself as designing, developing and marketing premium products for the action sports and youth lifestyle markets. According to Orange 21, its principal products are sunglasses and goggles which are marketed under the Spy Optic brand. Its stock is traded in an efficient market on the NASDAQ exchange.

12. Defendant Barry Buchholtz ("Buchholtz") is, and at all relevant times was, Chief Executive Officer and a director of Orange 21. Buchholtz signed the false and misleading Registration Statement. Buchholtz was promoted to Chief Executive Officer in July 2004 from his prior position as President of the Company.

13. Defendant Michael Brower ("Brower") is, and at all relevant times was, Chief Financial Officer, Treasurer and Secretary of Orange 21. Brower signed the false and misleading Registration Statement.

14. Defendant Mark Simo ("Simo") is, and at all relevant times was, Chairman of the Board of Directors of Orange 21. Simo signed the false and misleading Registration Statement. Simo is also the Chief Executive Officer and Chairman of the Board of Directors of No Fear, and owns 31% of No Fear common stock. Simo was also the Chief Executive Officer of Orange 21 (f/k/a Spy Optic, Inc.) from August 1994 to July 2004.

15. Defendant Harry L. Casari ("Casari") is, and at all relevant times was, a director of Orange 21. Casari signed the false and misleading Registration Statement.

- 3 -                                                                      05-CV-0595-JM(BLM)

16. Defendant David R. Mitchell ("Mitchell") is, and at all relevant times was, a director of Orange 21. Mitchell signed the false and misleading Registration Statement.

17. Defendant Roger S. Penske, Jr. ("Penske") is, and at all relevant times was, a director of Orange 21. Penske signed the false and misleading Registration Statement.

18. Defendant Greg Theiss ("Theiss") is, and at all relevant times was, a director of Orange 21. Theiss signed the false and misleading Registration Statement.

19. Defendant Jeffrey Theodosakis ("Theodosakis") is, and at all relevant times was, a director of Orange 21. Theodosakis signed the false and misleading Registration Statement.

20. The defendants referenced above in ¶¶12-19 are referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

21. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired shares of Orange 21 common stock traceable to the Company's false and misleading Registration Statement for its IPO (the "Class"), and who were damaged thereby. Excluded from the Class are the defendants named herein, the officers and directors of Orange 21, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22. The members of the Class are so numerous that joinder of all members is impracticable. Orange 21 stock was actively traded on the NASDAQ exchange. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that hundreds, if not thousands, of investors purchased or otherwise acquired Orange 21 common stock pursuant to the IPO, rendering joinder of all such purchasers impracticable. Record owners and other members of the Class may be identified from

records maintained by Orange 21 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Orange 21 has more than 7 million shares of stock outstanding.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the 1933 Act that is complained of herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the 1933 Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the finances, business, operations and management of Orange 21; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Plaintiff knows of no difficulty that will be encountered in the management of this action as a class action.

## BACKGROUND

27.    In 1992, Orange 21 was originally incorporated as Sports Color, Inc., a wholly owned subsidiary of No Fear. In 1994, the name was changed to Spy Optic, Inc. ("Spy Optic"). On November 29, 2004, Spy Optic was reincorporated in the State of Delaware and renamed Orange 21.

28.    Leading up to the IPO, Orange 21 (f/k/a Spy Optic) was a private company with limited capital and numerous financial difficulties. Much of Orange 21's financial strife was caused by No Fear, its controlling shareholder. From 2002 to September 30, 2004, No Fear accounted for $1,540,000 of Orange 21's sales. Orange 21 had failed to collect on nearly all of these receivables. Indeed, as of September 30, 2004, No Fear had failed to pay $1,508,000 for its purchases from Orange 21. No Fear's failure to pay had become so severe the two companies executed an agreement which stated: "No Fear will be required to comply with the payment terms and conditions set forth in the agreement. In the future, [Orange 21] will cease selling products to No Fear if No Fear does not comply with the terms of this contract."

29.    The bleeding, however, did not stop there. In May and June of 2004 – while No Fear was in arrears to Orange 21 for nearly $1.2 million – Orange 21 loaned No Fear $400,000 for working capital. Two months later, in August 2004, Orange 21 loaned No Fear an additional $98,000.

30.    Instead of demanding payment for the outstanding accounts receivables and indebtedness from No Fear, in July 2004, Orange 21 allowed No Fear to issue a promissory note in the amount of $1.6 million ($1.2 million due, as of July 2004, from accounts receivable and $400,000 due from the working capital loan). No Fear needed the IPO as much as Orange 21 did, as a portion of No Fear's proceeds would be used to repay the outstanding monies it owed to Orange 21.

31.    At this same time, Orange 21 was sent scrambling to stem its other financial problems. In May and June 2004 – at the same time it loaned its controlling shareholder (No Fear) $400,000 – Orange 21 desperately needed more cash. It resorted to selling over 350,000 shares to private investors for total consideration of $1,720,500. In August 2004, Orange 21 consolidated all of its loan facilities with Comerica Bank owing the bank a total of $7.1 million, which was due in full in ten months. On December 2, 2004 – *just 12 days before the IPO* – Orange 21 needed access to more cash. It obtained an additional $1 million credit facility with Comerica Bank, which it drew down immediately and in its entirety. Orange 21 needed the IPO to pay off this facility as Orange 21 came to an agreement with Comerica that this $1 million would be repaid with the proceeds from the IPO. In addition, by September 30, 2004, Orange 21 was indebted to at least two private lenders totaling $300,000 – one loan for $200,000 and one loan for $100,000. Orange 21 agreed to repay the $200,000 loan with the proceeds of the IPO. Orange 21 did not pay the $100,000 loan in cash, but repaid the lender by giving it 20,833 shares of its common stock.

32.    Through the end of 2003 into 2004, Orange 21 was in violation of numerous financial covenants with Comerica. For example, Orange 21 breached its financial covenant on June 30, 2004 by incurring more than two consecutive quarterly losses. Orange 21 incurred losses in 4Q03, 1Q04, and 2Q04.

## SUBSTANTIVE ALLEGATIONS

33.    On December 14, 2004, defendants issued Orange 21's Registration Statement for the sale of 3.48 million shares. Orange 21's Registration Statement made the following false and misleading statements:

> We plan to employ our distribution models to increase distribution of our products internationally and enable our international distributors to focus their efforts on regional sales and marketing programs.

*    *    *

Expand International Distribution: We believe significant opportunities exist to increase our sales outside of the United States, and we are actively expanding distribution worldwide.

*       *       *

In addition to our traditional distribution model, we are developing two models of international distribution which do not rely exclusively upon our international distributors and their sales representatives.

*       *       *

We successfully tested the Dealer Direct program in Canada through 600 retail accounts during the fiscal year ended December 31, 2003, and we intend to expand use of this distribution model into a second territory in 2005.

*       *       *

Our efforts to protect our intellectual property may not be effective and may be challenged by third parties.

*       *       *

We may be subject to claims by third parties for alleged infringement of their proprietary rights, which are costly to defend, could require us to pay damages and could limit our ability to use certain technologies in the future.

From time to time, we may receive notices of claims of infringement, misappropriation or misuse of other parties' proprietary rights.

34.     The statements in Orange 21's Registration Statement were materially false and misleading for at least three reasons:

(a)     The statements regarding Orange 21's international distribution model, and more specifically its intent to transition to a dealer-direct model, were false and misleading when made, as discussed in greater detail at ¶¶41-55, *infra*. By the time these statements were made, Orange 21 already had transitioned to a dealer-direct model twice in a foreign country. Because of these transitions from a non-exclusive sales representative model to a dealer-direct model in Canada, Orange 21 was aware of the costs involved with such a transition. Furthermore, before the IPO, CEO Buchholtz was given presentations of what it would cost to go to a dealer-direct model in Europe. Nonetheless, Orange 21 failed to disclose that this transition would cost the Company at least $600,000 to $700,000 per year. This omission from the Registration Statement was material to investors and should have been disclosed.

(b)    The statements regarding boilerplate claims of infringement against Orange 21 were false and misleading when made, as discussed in greater detail at ¶¶35-37, *infra*. At the time of the IPO, Orange 21 had been informed by Oakley on more than one occasion that it was engaging in patent and trademark infringement of Oakley products and that Oakley was considering filing suit. Omitting such information made the above statements materially false and misleading.

(c)    Orange 21 did not, and never has, disclosed a December 13, 2004 letter from Iacon threatening to reduce or stop its purchases of Spy products. Nor did Orange 21 supplement its Registration Statement to inform investors that Iacon actually stopped purchasing Spy products altogether in the first part of 1Q05, as discussed in greater detail at ¶¶38-40, *infra*. This omission from the Registration Statement was material to investors and should have been disclosed.

35.    In early 2004, Oakley, a competitor of Orange 21, began discussions with Orange 21 to acquire the Company. During these discussions, Oakley informed Mark Simo, Chairman of the Board for Orange 21, and Barry Buchholtz, CEO of Orange 21, that Orange 21 was engaging in patent infringement of Oakley products. In addition, Simo and Buchholtz were informed that Orange 21's "e-sunglass" design was potentially infringing on Oakley's "E" product trademark. Oakley further informed Simo and Buchholtz that if the acquisition negotiations between the two companies failed, Oakley was considering a patent and trademark infringement suit against Orange 21. The acquisition negotiations between Orange 21 and Oakley collapsed in late 2004. Thus, at the time of Orange 21's IPO, on December 14, 2004, Orange 21 knew that Oakley was considering suit against Orange 21 for patent and trademark infringement.

36.    On March 7, 2005, Oakley filed a complaint in the United States District Court for the Central District of California against Orange 21 alleging a number of claims, including patent and trademark infringement.

37.    On March 22, 2005, Orange 21 disclosed Oakley had brought suit against Orange 21. This disclosure caused the stock to continue trading well below the IPO price of $8.75 per share and to trend downward, ultimately closing at less than $5.00 per share in late June 2005.

38.    Orange 21's troubles were not only limited to Oakley, but also included Iacon, a subsidiary of Oakley. Iacon was one of Orange 21's largest volume resellers of Spy products.

39.    In 2004, Iacon was purchasing Spy products at a 23% discount to what Orange 21 normally sold to its wholesalers due to Iacon's large volume purchases. In July 2004, Iacon demanded an even deeper discount of 30% from Orange 21. Orange 21 rejected this demand. On December 13, 2004 – one day before Orange 21's IPO – Iacon sent a letter to Orange 21's Vice President of Sales, John Gothard, which was carbon-copied to Buchholtz, stating that because of Orange 21's refusal to negotiate a deeper discount with Iacon, Iacon would reduce the volume of its purchases of Spy products going forward, and in some cases, would stop carrying Spy products altogether.

40.    Indeed, Iacon did not purchase any products from Orange 21 from December 13, 2004 until February 25, 2005, when Orange 21 agreed to provide deeper discounts on Iacon's purchases. Orange 21 failed to inform investors in the Registration Statement that Iacon would severely reduce its purchases from Orange 21, and failed to update its Registration Statement to disclose that Iacon had stopped purchasing from Orange 21.

41.    Despite the financial, business and legal troubles surrounding Orange 21, the Company still planned to restructure its international sales and distribution model. This restructure would eliminate its reliance on independent, non-exclusive sales representatives to sell its products and shift to a model known as dealer direct. The dealer-direct model relied upon dealers, or exclusive sales representatives, to sell Orange 21's Spy products. Orange 21 had long depended on

05-CV-0595-JM(BLM)

international sales to boost its bottom line. It had sales in over 35 countries and, for the last four years, international sales consistently made up more than 20% of Orange 21's total sales.

42. In February 2004, Orange 21 brought in Karl Hingel. As Vice President of the International Division, Hingel was responsible for developing Orange 21's international business. Hingel came to Orange 21 with extensive international experience as the Director of Global Development at Oakley. While Hingel was at Oakley from 1994 to 2003, Oakley's international business grew from less than $50 million in revenues to over $250 million.

43. At this point, Orange 21 had significant experience restructuring its sales and distribution model in foreign countries. On at least two different occasions, Orange 21 had converted from a non-exclusive sales representative model to a dealer-direct model. For example, in 2000, Orange 21 went to dealer-direct model in Canada. Orange 21 subsequently reverted back to the non-exclusive distribution model a year later. In 2003, Orange 21 once again shifted its Canadian sales operation from a non-exclusive sales-representative model to a dealer-direct model. As a result of these two transitions, Orange 21 was well aware of the costs associated with such a restructuring.

44. For years Orange 21 had analyzed what it would cost to transition its international sales to a dealer-direct model. Indeed, presentations were given to CEO Buchholtz on the costs associated with switching to a dealer-direct model in Europe. The presentations outlined the areas that Spy Optic would have to expand its involvement, such as marketing and distribution, *and the costs related to switching to a dealer-direct sales model*. In an e-mail sent to Buchholtz from his Director of International Sales, Buchholtz was told: "*if you are not prepared to spend money, do not even think of selling dealer direct in Europe.*"

45. Orange 21 did not have the capital to fully operationalize a dealer-direct model for its international sales. Building such an infrastructure would cost hundreds of thousands of dollars a

year – hundreds of thousands of dollars Orange 21 did not have. After all, Orange 21's financial situation was already precarious.

46.    In order to raise the cash that Orange 21 and No Fear (Orange 21's controlling shareholder) needed to repay their loans, as well as to fully operationalize the Italian and French dealer-direct infrastructure, Orange 21 reached out to public investors.

47.    Orange 21 peppered its Registration Statement with statements relating to the significance of its international sales model:

- "We believe significant opportunities exist to increase our sales outside of the United States, and we are actively expanding distribution worldwide."

- "In addition to our traditional distribution model, we are developing two models of international distribution which do not rely exclusively upon our international distributors and their sales representatives."

- "We successfully tested the Dealer Direct program in Canada through 600 retail accounts during the fiscal year ended December 31, 2003, and we intend to expand use of this distribution model into a second territory in 2005."

48.    Though Orange 21 told investors about its expansion plans, it failed to include the most significant fact in its Registration Statement: a restructured sales and distribution model would cost Orange 21 at least $600,000 to $700,000 per year.

49.    In the IPO, Orange 21 sold 2.48 million of its shares and No Fear sold 1 million of Orange 21's shares. With the IPO price determined at $8.75 per share, Orange 21 and No Fear planned for gross proceeds of $21.7 million and $8.75 million, respectively. With these proceeds, No Fear paid all monies owed to Orange 21 ($1.6 million due from the promissory note and all outstanding accounts payable to Orange 21). Orange 21 repaid its $7.1 million credit facility with Comerica Bank, including the $1 million facility it had obtained just weeks earlier.

50.    On January 28, 2005 – six weeks after the IPO – Orange 21 issued a press release stating it was restructuring its sales and distribution model in France and Italy. Again, Orange 21 did not reveal to the market the costs associated with the restructuring:

Orange 21 Inc. today announced that its wholly-owned subsidiary Spy Optic, Inc. ("Spy") is converting its business model from distributor to dealer direct in France and Italy. This transition is a continuation of the company's distribution strategy for the European marketplace. France and Italy represent key target markets for Spy's international expansion and will provide a cornerstone for expansion of the company's goggle, sunglass and accessory products throughout Europe.

Both territories will be supported by regional Spy sales representatives and a sales and marketing staff located at Spy's European headquarters in Italy. The direct territories are managed by Massimo Bonfanti, who joined Spy last May after spending three years at Type 20, which markets Briko and Arnette brands.

"We're excited about moving to a dealer direct model in France and Italy. We believe that the change will allow us to provide better service and greatly expand our dealer network, particularly in the rapidly expanding European marketplace. In addition, we expect that the dealer model will allow us to establish stronger connections with our retail partners throughout Europe," said Ron Perkins, General Manager for Spy Optics, SRL.

51.    In Orange 21's February 17, 2005 press release, issued two months after the IPO, the Company stated:

"Due to Spy Optic's strong growth opportunities in Europe, we have decided to expedite our investment in this marketplace. As a result, and as we outlined last month in our press release dated January 28, 2005, we have made the decision to transition to a dealer direct distribution program from a distributor program in Italy and France. Although this transition will involve upfront costs to the Company, we believe that it represents significant, long-term strategic benefits to the Company and is necessary to achieve our growth plans for the European market."

52.    During the February 17, 2005 conference call between analysts and executives of Orange 21, analysts made numerous attempts to obtain information from Orange 21 regarding the costs associated with this restructure. Finally, Buchholtz admitted that it would cost Orange 21 at least $600,000 to $700,000 a year to implement its new dealer-direct model in France and Italy.

53.    On the February 17, 2005 conference call, Buchholtz admitted for the first time:

Kevin Foley:    So is it a – I want to get this – the analysts were at 2.2 million net income, I can assume anything different was all of sales and marketing invested in Europe?

Barry Buchholtz:  Yes correct. We're estimating $600-$700,000 investment a year.

Kevin Foley:    $600-$700,000?

Barry Buchholz:   Yes, a range in our forecast the $600,000 plus.

- 13 -                                      05-CV-0595-JM(BLM)

54.    Analysts were shocked and disturbed by Orange 21's disclosure and criticized Orange 21 for failing to inform investors of this cost at the time of the IPO:

- "[T]he costs with that expansion as well as the timing of those costs *were not clearly communicated to the Street.*"

- "[B]ecause the costs associated with European expansion are mostly absorbed up-front and growth is not expected to materialize until 2006, we believe there is enough execution risk to warrant a cautious rating and conservative estimates."

- *"[I]n our opinion management credibility has been damaged.*"

- "Operating as a private company, the company had limited access to capital and thus couldn't aggressively expand until after the IPO. Subsequently, management accelerated the European expansion, which pressured near-term earnings as increases associated with SG&A were absorbed up-front."

55.    This information was plainly material as its disclosure caused Orange 21's stock price to plummet as shown in the following chart. On February 18, 2005, Orange 21's stock price fell over 30% *from $9.50 to $6.60 on volume of 2.3 million shares.* Orange 21 was forced to lower its 2005 earnings per share estimate of $0.17-$0.19, well below analysts' estimates of $0.27.



**Orange 21 Inc.**
**Daily Share Pricing: December 14, 2004 to July 1, 2005**

## FIRST CLAIM FOR RELIEF

### For Violation of Section 11 of the 1933 Act
### Against All Defendants

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Orange 21 and the Individual Defendants for violations of §11 of the 1933 Act, 15 U.S.C. §77k.

57.     Each of the defendants named herein is liable because the Registration Statement was materially false and misleading; contained untrue statements of material fact; omitted to state material facts necessary to make the statements made in the Registration Statement, under the circumstances in which they were made, not misleading; and failed to disclose material facts.

58.     Orange 21 was the registrant for the securities issued in the December 14, 2004 IPO pursuant to the Registration Statement, and caused the Registration Statement to be signed on its behalf.  As the registrant and as a signatory of the Registration Statement, Orange 21 is liable to plaintiff and the Class members for the material misstatements and omissions contained in the Registration Statement.

59.     The Individual Defendants each signed the Registration Statement.  Because the Registration Statement contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the facts stated therein not misleading, each of the Individual Defendants is liable as a "person who signed the Registration Statement," under §11(a)(1), 15 U.S.C. §77k(a)(1).

60.     Defendants Buchholtz, Simo, Casari, Mitchell, Penske, Theiss and Theodosakis were directors of Orange 21 when the Registration Statement became effective.  Because the Registration Statement contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the facts stated therein not misleading, each of these defendants is liable as a "director" as that term is defined in §11(a)(2), 15 U.S.C. §77k(a)(2).

61.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements described above, which were contained in the Registration Statement, were accurate and complete in all material respects.

62.    Plaintiff and other members of the Class have sustained damages. The value of Orange 21 common stock declined precipitously due to and subsequent to the disclosure of defendants' violations.

63.    Plaintiff and other members of the Class purchased or otherwise acquired Orange 21 common stock pursuant and traceable to the Registration Statement without knowledge of the untruths or omissions alleged herein, and sustained damages as a result. At the time plaintiff purchased Orange 21 common stock in the IPO, plaintiff and the other members of the Class did not know, or by the reasonable exercise of care could not have known, of the facts concerning the inaccurate and misleading statements alleged herein.

64.    This action was brought within one year after the discovery of the untrue statements and omissions and less than three years after the IPO.

65.    The defendants are liable to plaintiff and other members of the Class.

**SECOND CLAIM FOR RELIEF**

**For Violation of Section 15 of the 1933 Act**
**Against the Individual Defendants**

66.    Plaintiff repeats and realleges the allegations above, as if fully set forth herein.

67.    The Individual Defendants were controlling persons of Orange 21 within the meaning of §15 of the 1933 Act by virtue of their positions as senior officers and directors at Orange 21 and their power to control Orange 21's corporate actions and the transactions alleged herein, which give rise to Orange 21's liability under the securities laws. In particular, the Individual Defendants controlled the contents and the issuance of the false and misleading Registration Statement.

68.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement for the IPO were true and devoid of any omissions of material fact. Therefore, by reason of their status as controlling persons at the Company, as alleged herein, pursuant to §15 of the 1933 Act, each of these defendants is liable jointly and severally with and to the same extent that Orange 21 is liable to plaintiff and the members of the Class as a result of the wrongful conduct alleged herein.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    *Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;*

C.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E.    Such equitable/injunctive or other relief as deemed just and appropriate by the Court.

<strong>JURY DEMAND</strong>

Plaintiff hereby demands a trial by jury.

DATED: October 11, 2005

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DANIEL S. DROSMAN
TED MINAHAN

_____
DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Orange 21\CTP00025038.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CHRISTINE PITTMAN ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 12/29/04 | 500 shares | $10.22 |
| 01/12/05 | 100 shares | $10.50 |
|  |  |  |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 01/27/05 | 500 shares | $9.50 |
| 02/22/05 | 100 shares | $6.10 |
|  |  |  |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10th_ day of _March_, 2005.

_____
CHRISTINE PITTMAN

G:\pot lit cert letters\pittman Orange 21.doc

ORANGE 21

## DECLARATION OF SERVICE BY MAIL AND FACSIMILE

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on October 11, 2005, declarant served the CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List. Declarant also served the parties by facsimile.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of October, 2005, at San Diego, California.

_____
ANGELA E. MUELLER

ORANGE 21 (LEAD)

Service List - 10/11/2005 (05-0072)

Page 1 of 1

## Counsel For Defendant(s)

Bruce A. Ericson
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA  94105
  415/983-1000
  415/983-1200(Fax)

Walter J. Robinson III
Pillsbury Winthrop Shaw Pittman LLP
2475 Hanover Street
Palo Alto, CA  94304
  650/233-4500
  650/233-4545(Fax)

Richard M. Segal
Pillsbury Winthrop Shaw Pittman LLP
101 West Broadway, Suite 1800
San Diego, CA  92101
  619/234-5000
  619/236-1995(Fax)

## Counsel For Plaintiff(s)

William S. Lerach
Daniel S. Drosman
Ted  Minahan
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423(Fax)