USDC SCAN INDEX SHEET

















TKL    4/10/06    8:41

3:05-CV-00595   ORANGE 21 INC. SEC. V.

*45*

*AMDCMP.*

☐ **ORIGINAL**

FILED

2006 APR -7 PM 3: 44

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH (68581)
DANIEL S. DROSMAN (200643)
TED MINAHAN (227969)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORANGE 21 INC. SECURITIES LITIGATION | No. 05-CV-0595-JM(BLM) |
| | CLASS ACTION |
| This Document Relates To: | AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |
| | DEMAND FOR JURY TRIAL |

## INTRODUCTION AND OVERVIEW

1.      This is a class action on behalf of those who purchased or otherwise acquired the common stock of Orange 21, Inc. ("Orange 21" or the "Company") pursuant to the Company's Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with its December 14, 2004 initial public offering ("IPO"), seeking to pursue remedies under §§11 and 15 of the Securities Act of 1933 ("1933 Act"). Orange 21 designs, develops and markets products for the action sports and youth lifestyle markets, including sunglasses, goggles, apparel, and accessories. Its principal products, sunglasses and goggles, are marketed under the brand Spy Optic. The Company sells its products in approximately 4,100 retail locations in the United States and through approximately 2,000 international retail locations serviced by the Company and its international distributors.

2.      Orange 21 went public on December 14, 2004, when it accomplished its IPO of 3.48 million shares at $8.75 per share. Pursuant to the Registration Statement, Orange 21 sold 2.48 million of those shares for net proceeds of $18.9 million. Orange 21's largest and controlling shareholder (which owned 41% of Orange 21's stock) No Fear, Inc. ("No Fear"), sold 1 million shares – approximately 27% of its holdings – pocketing $8.1 million.

3.      The Registration Statement violated 1933 Act §11, for it contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" because although it stated that "we intend to expand use of this [dealer-direct] distribution model into a second territory in 2005," it omitted material information that this transition would cost the Company at least $600,000 to $700,000. This is indisputably material given that *Orange 21's entire net earnings for all of 2004 were just $807,000*. In other words, the omitted transition costs were nearly equivalent to the Company's annual net earnings – meaning that the planned expansion would effectively wipe out the Company's expected profits for at least the next year.

4.      On February 17, 2005 – just over two months after the IPO – Orange 21 disclosed to the market that it planned to restructure its sales and distribution model in Italy and France at a cost of at least $600,000 to $700,000 annually. *This news caused Orange 21's stock price, which was*

*previously trading at $9.50, to collapse to $6.60 per share on volume of 2.3 million shares, by far the largest one-day price drop (31% fall from the previous day's close) and stock volume for Orange 21 since it went public.*

5.   Orange 21's stock price never recovered from this blow and continued to trend downward, ultimately trading at about $4.50 per share in early April 2006.

## JURISDICTION AND VENUE

6.   The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act (15 U.S.C. §§77k and 77o).

7.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

8.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the defendants maintain offices in this District and many of the acts and practices complained of herein occurred in substantial part in this District, including the preparation and dissemination of untrue statements of material fact and the omission of material information complained of herein.

9.   In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

10.   Plaintiff Christine Pittman acquired the common stock of Orange 21 pursuant to the Company's Registration Statement filed in connection with the IPO, as set forth in the accompanying certification, and has been damaged thereby.

11.   Defendant Orange 21 is headquartered in Carlsbad, California, and describes itself as designing, developing, and marketing premium products for the action sports and youth lifestyle markets. According to Orange 21, its principal products are sunglasses and goggles marketed under the Spy Optic brand. Its stock is traded in an efficient market on the NASDAQ exchange.

12.   Defendant Barry Buchholtz ("Buchholtz") is, and at all relevant times was, Chief Executive Officer and a director of Orange 21. Buchholtz signed the Registration Statement.

Buchholtz was promoted to Chief Executive Officer in July 2004 from his prior position as President of the Company.

13. Defendant Michael Brower ("Brower") is, and at all relevant times was, Chief Financial Officer, Treasurer and Secretary of Orange 21. Brower signed the Registration Statement.

14. Defendant Mark Simo ("Simo") is, and at all relevant times was, Chairman of the Board of Directors of Orange 21. Simo signed the Registration Statement. Simo is also the Chief Executive Officer and Chairman of the Board of Directors of No Fear, and owns 31% of No Fear common stock. Simo was also the Chief Executive Officer of Orange 21 (f/k/a Spy Optic, Inc.) from August 1994 to July 2004. On the date of the IPO, Simo owned more than 2 million shares of Orange 21 stock.

15. Defendant Harry L. Casari ("Casari") is, and at all relevant times was, a director of Orange 21. Casari signed the Registration Statement.

16. Defendant David R. Mitchell ("Mitchell") is, and at all relevant times was, a director of Orange 21. Mitchell signed the Registration Statement. On the date of the IPO, Mitchell owned almost 100,000 shares of Orange 21 stock.

17. Defendant Roger S. Penske, Jr. ("Penske") is, and at all relevant times was, a director of Orange 21. Penske signed the Registration Statement. On the date of the IPO, Penske owned more than 29,000 shares of Orange 21 stock.

18. Defendant Greg Theiss ("Theiss") is, and at all relevant times was, a director of Orange 21. Theiss signed the Registration Statement. On the date of the IPO, Theiss owned more than 200,000 shares of Orange 21 stock.

19. Defendant Jeffrey Theodosakis ("Theodosakis") is, and at all relevant times was, a director of Orange 21. Theodosakis signed the Registration Statement. On the date of the IPO, Theodosakis owned more than 87,000 shares of Orange 21 stock.

20. The defendants referenced above in ¶¶12-19 are referred to herein as the "Individual Defendants."

05-CV-0595-JM(BLM)

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired shares of Orange 21 common stock in the IPO or traceable to the Company's Registration Statement for the IPO (the "Class"), and who were damaged thereby.  Excluded from the Class are the defendants named herein, the officers and directors of Orange 21, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

22.    The members of the Class are so numerous that joinder of all members is impracticable.  Orange 21's stock was actively traded on the NASDAQ exchange.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that hundreds, if not thousands, of investors purchased or otherwise acquired Orange 21 common stock pursuant to the IPO, rendering joinder of all such purchasers impracticable.  Record owners and other members of the Class may be identified from records maintained by Orange 21 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Orange 21 has more than seven million shares of stock outstanding.

23.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the misleading Registration Statement in violation of the 1933 Act that is complained of herein.

24.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class.

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the 1933 Act was violated by defendants' acts as alleged herein;

(b)     whether Orange 21's Registration Statement contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading"; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress defendants' violation of the 1933 Act.  Plaintiff knows of no difficulty that will be encountered in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

27.     On December 14, 2004, defendants issued Orange 21's Registration Statement for the sale of 3.48 million shares.  Orange 21's Registration Statement contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading":

We plan to employ our distribution models to increase distribution of our products internationally and enable our international distributors to focus their efforts on regional sales and marketing programs.

*     *     *

Expand International Distribution: We believe significant opportunities exist to increase our sales outside of the United States, and we are actively expanding distribution worldwide.

*     *     *

In addition to our traditional distribution model, we are developing two models of international distribution which do not rely exclusively upon our international distributors and their sales representatives.

*     *     *

We successfully tested the Dealer Direct program in Canada through 600 retail accounts during the fiscal year ended December 31, 2003, and we intend to expand use of this distribution model into a second territory in 2005.

-5-                                    05-CV-0595-JM(BLM)

28.     In its Registration Statement, Orange 21 made clear that it had decided to *"expand use of this [dealer-direct] distribution model into a second territory in 2005"* and told investors about the significance of its international sales model. *See* ¶27.

29.     The Registration Statement contained an omission or "untrue statement of a material fact," however, because it omitted to explain that *this transition would cost the Company at least $600,000 to $700,000 per year*. This omission from the Registration Statement was material to investors and should have been disclosed. Indeed, the cost of the transition – $600,000 to $700,000 – is indisputably material given that *Orange 21's entire net earnings for all of 2004 were just $807,000*. In other words, the omitted transition costs were nearly equivalent to the Company's annual net earnings – meaning that the planned expansion would effectively wipe out the Company's expected profits for at least the next year.

30.     Each of the defendants owed to the purchasers of Orange 21 stock a duty to make a reasonable and diligent investigation of the adequacy of statements contained in the Registration Statement. None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described in ¶27, which were contained in the Registration Statement, were accurate and complete in all material respects. Thus, although defendants told investors about Orange 21's expansion plans, they negligently omitted information in the Registration Statement that a restructured sales and distribution model would cost Orange 21 at least $600,000 to $700,000 per year.

31.     By the time these statements were made, Orange 21 already had transitioned to a dealer-direct model twice in a foreign country. Furthermore, before the IPO, CEO Buchholtz was given presentations of what it would cost to go to a dealer-direct model in Europe.

32.     The dealer-direct model relied upon dealers, or exclusive sales representatives, to sell Orange 21's Spy products. Orange 21 had sales in over 35 countries and, for the last four years, international sales consistently made up more than 20% of Orange 21's total sales.

33.     In February 2004, Orange 21 brought in Karl Hingel. As Vice President of the International Division, Hingel was responsible for developing Orange 21's international business. Hingel came to Orange 21 with extensive international experience as the Director of Global

Development at Oakley, Inc. ("Oakley"). While Hingel was at Oakley from 1994 to 2003, Oakley's international business grew from less than $50 million in revenues to over $250 million.

34.     At this point, Orange 21 had significant experience restructuring its sales and distribution model in foreign countries. On at least two different occasions, Orange 21 had converted from a non-exclusive sales representative model to a dealer-direct model. For example, in 2000, Orange 21 went to dealer-direct model in Canada. Orange 21 subsequently reverted back to the non-exclusive distribution model a year later. In 2003, Orange 21 once again shifted its Canadian sales operation from a non-exclusive sales-representative model to a dealer-direct model.

35.     For years Orange 21 had analyzed what it would cost to transition its international sales to a dealer-direct model, giving presentations to CEO Buchholtz on the costs associated with switching to a dealer-direct model in Europe. The presentations outlined the areas that Spy Optic would have to expand its involvement, such as marketing and distribution, *and the costs related to switching to a dealer-direct sales model.* In an e-mail sent to Buchholtz before the IPO from his Director of International Sales, Buchholtz was told: "*if you are not prepared to spend money, do not even think of selling dealer direct in Europe.*"

36.     Based on this history, therefore, had defendants conducted a reasonable and prudent investigation, they would have known the costs of transitioning to a dealer-direct model in Italy and France, and could have alerted investors to those costs in the Registration Statement.

37.     On January 28, 2005 – six weeks after the IPO – Orange 21 issued a press release stating it was restructuring its sales and distribution model in France and Italy. Defendants announced that they had *already* determined which of Orange 21's products would be distributed under this model. They had *already* considered and determined how to staff this transition and had already located and determined an international headquarters for the transition. They had also located and hired an individual who would be responsible for the dealer-direct sales in France and Italy. Orange 21 acknowledged that it had hired this individual – Massimo Bonfanti – seven months earlier.

> Orange 21 Inc. today announced that its wholly-owned subsidiary Spy Optic, Inc. ("Spy") is converting its business model from distributor to dealer direct in France and Italy. This transition is a continuation of the company's distribution strategy for

the European marketplace. France and Italy represent key target markets for Spy's international expansion and will provide a cornerstone for expansion of the company's goggle, sunglass and accessory products throughout Europe.

Both territories will be supported by regional Spy sales representatives and a sales and marketing staff located at Spy's European headquarters in Italy. The direct territories are managed by Massimo Bonfanti, who joined Spy last May after spending three years at Type 20, which markets Briko and Arnette brands.

"We're excited about moving to a dealer direct model in France and Italy. We believe that the change will allow us to provide better service and greatly expand our dealer network, particularly in the rapidly expanding European marketplace. In addition, we expect that the dealer model will allow us to establish stronger connections with our retail partners throughout Europe," said Ron Perkins, General Manager for Spy Optics, SRL.

38. In Orange 21's February 17, 2005 press release, issued two months after the IPO, the Company stated:

"Due to Spy Optic's strong growth opportunities in Europe, we have decided to expedite our investment in this marketplace. As a result, and as we outlined last month in our press release dated January 28, 2005, we have made the decision to transition to a dealer direct distribution program from a distributor program in Italy and France. Although this transition will involve upfront costs to the Company, we believe that it represents significant, long-term strategic benefits to the Company and is necessary to achieve our growth plans for the European market."

39. During the February 17, 2005 conference call between analysts and executives of Orange 21, analysts made numerous attempts to obtain information from Orange 21 regarding the "upfront" costs associated with this restructure. Finally, Buchholtz told analysts that it would cost Orange 21 at least $600,000 to $700,000 a year to implement its new dealer-direct model in France and Italy.

40. On the February 17, 2005 conference call, Buchholtz engaged analyst Kevin Foley in the following colloquy:

Kevin Foley:    So is it a – I want to get this – the analysts were at 2.2 million net income, I can assume anything different was all of sales and marketing invested in Europe?

Barry Buchholtz:  Yes correct. We're estimating $600-$700,000 investment a year.

Kevin Foley:    $600-$700,000?

Barry Buchholz:  Yes, a range in our forecast the $600,000 plus.

41. Analysts were shocked and disturbed by Orange 21's belated disclosure, and criticized Orange 21 for failing to inform investors of this cost at the time of the IPO:

05-CV-0595-JM(BLM)

- "[T]he costs with that expansion as well as the timing of those costs *were not clearly communicated to the Street.*"

- "[B]ecause the costs associated with European expansion are mostly absorbed up-front and growth is not expected to materialize until 2006, we believe there is enough execution risk to warrant a cautious rating and conservative estimates."

- *"[I]n our opinion management credibility has been damaged."*

- "Operating as a private company, the company had limited access to capital and thus couldn't aggressively expand until after the IPO. Subsequently, management accelerated the European expansion, which pressured near-term earnings as increases associated with SG&A were absorbed up-front."

42. This disclosure caused Orange 21's stock price to plummet, injuring purchasers of the stock in the IPO or traceable to it, as shown in the following chart. On February 18, 2005, Orange 21's stock price fell over 30% *from $9.50 to $6.60 on volume of 2.3 million shares.* Orange 21 was forced to lower its 2005 earnings per share estimate of $0.17-$0.19, well below analysts' estimates of $0.27. Orange 21's stock never recovered from the decline, and currently languishes at about $4.50 per share.



**Orange 21 Inc.**
**Daily Share Pricing: December 14, 2004 to July 1, 2005**

- 9 -

## FIRST CLAIM FOR RELIEF

### For Violation of Section 11 of the 1933 Act
### Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Orange 21 and the Individual Defendants for violations of §11 of the 1933 Act, 15 U.S.C. §77k.  This claim is based solely on allegations of strict liability and/or negligence under the 1933 Act.

44.     Each of the defendants named herein is liable because Orange 21's Registration Statement contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

45.     Orange 21 was the registrant for the securities issued in the December 14, 2004 IPO pursuant to the Registration Statement, and caused the Registration Statement to be signed on its behalf.  As the registrant and as a signatory of the Registration Statement, Orange 21 is strictly liable to plaintiff and the Class members for the material untrue statements and omissions contained in the Registration Statement.

46.     The Individual Defendants each signed the Registration Statement.  Because the Registration Statement contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the facts stated therein not misleading, each of the Individual Defendants is liable as a "person who signed the Registration Statement," under §11(a)(1), 15 U.S.C. §77k(a)(1).

47.     Defendants Buchholtz, Simo, Casari, Mitchell, Penske, Theiss and Theodosakis were directors of Orange 21 when the Registration Statement became effective.  Because the Registration Statement contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the facts stated therein not misleading, each of these defendants is liable as a "director" as that term is defined in §11(a)(2), 15 U.S.C. §77k(a)(2).

48.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements described in ¶27, which were contained in the Registration Statement, were accurate and complete in all material respects.

49. Plaintiff and other members of the Class have sustained damages. The value of Orange 21 common stock declined precipitously due to and subsequent to the disclosure of the cost of transitioning to a dealer-direct distribution model.

50. Plaintiff and other members of the Class purchased or otherwise acquired Orange 21 common stock in the IPO, or pursuant and traceable to the Registration Statement, without knowledge of the untrue statements of material fact or omissions of material fact alleged herein, and sustained damages as a result. At the time plaintiff purchased Orange 21 common stock in the IPO, plaintiff and the other members of the Class did not know, or by the reasonable exercise of care could not have known, of the facts concerning the untrue statements and omissions of material fact alleged herein.

51. This action was brought within one year after the discovery of the untrue statements and omissions and less than three years after the IPO.

52. The defendants are liable to plaintiff and other members of the Class.

### SECOND CLAIM FOR RELIEF

**For Violation of Section 15 of the 1933 Act**
**Against the Individual Defendants**

53. Plaintiff repeats and realleges the allegations above, as if fully set forth herein.

54. The Individual Defendants were controlling persons of Orange 21 within the meaning of §15 of the 1933 Act (15 U.S.C. §77o) by virtue of their positions as senior officers and directors at Orange 21, their power to control Orange 21's corporate actions and the transactions alleged herein, and their ownership of a substantial amount of Orange 21 stock. In particular, the Individual Defendants controlled the contents and the issuance of the Registration Statement, which contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

55. None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement for the IPO were true and devoid of any omissions of material fact. Therefore, by reason of their status as controlling persons at the Company, as alleged herein, pursuant to §15 of the 1933 Act, each of these

defendants is liable jointly and severally with and to the same extent that Orange 21 is liable to plaintiff and the members of the Class as a result of the wrongful conduct alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

C.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E.    Such equitable/injunctive or other relief as deemed just and appropriate by the Court.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 7, 2006

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DANIEL S. DROSMAN
TED MINAHAN

_____
DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Orange 21\CPT00029754.doc .

- 12 -                                            05-CV-0595-JM(BLM)

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CHRISTINE PITTMAN ("Plaintiff") declares:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 12/29/04 | 500 shares | $10.22 |
| 01/12/05 | 100 shares | $10.50 |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 01/27/05 | 500 shares | $9.50 |
| 02/22/05 | 100 shares | $6.10 |
| | | |

5.   During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

6.   The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

ORANGE 21

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10th_ day of _March_, 2005.

_____
CHRISTINE PITTMAN

G:\pot lit cert letters\pittman Orange 21.doc

ORANGE 21

## DECLARATION OF SERVICE BY MAIL AND FACSIMILE

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    That on April 7, 2006, declarant served the **AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List. Declarant also served the parties by facsimile.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of April, 2006, at San Diego, California.

_____
ANGELA E. MUELLER



ORANGE 21 (LEAD)
Service List - 4/7/2006    (05-0072)
Page 1 of 1

**Counsel For Defendant(s)**

Walter J. Robinson III
Pillsbury Winthrop Shaw Pittman LLP
2475 Hanover Street ·
Palo Alto, CA 94304
  650/233-4500
  650/233-4545 (Fax)

Richard M. Segal
Pillsbury Winthrop Shaw Pittman LLP
101 West Broadway, Suite 1800
San Diego, CA 92101
  619/234-5000
  619/236-1995 (Fax)

Bruce A. Ericson
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228
  415/983-1000
  415/983-1200 (Fax)

**Counsel For Plaintiff(s)**

William S. Lerach
Daniel S. Drosman
Ted Minahan
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)